UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                              :
UNITED STATES                                                 :
                                                              :        S3 13 Cr. 633 (PAE)
            -v-                                               :
                                                              :        OPINION & ORDER
MICHAEL J. MITROW, JR.,                                       :
                                                              :
                             Defendant.                       :
                                                              :
------------------------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED: 9/8/15

PAUL A. ENGELMAYER, District Judge:

　　This decision resolves a disputed loss calculation under the Sentencing Guidelines.

　　On January 29, 2015, defendant Michael J. Mitrow, Jr. ("Mitrow") pled guilty to two

counts in Indictment S3 13 Cr. 633:  Count Three, charging a conspiracy to commit wire fraud in

violation of 18 U.S.C. §§ 1343 and 1349, and Count Eight, charging tax evasion, in violation of

26 U.S.C. § 7201.  Both crimes were committed, and the others charged in the Indictment were

alleged to have been committed, in connection with Access Communications ("Access"), a

pharmaceutical marketing company that Mitrow founded and at all relevant times served as

President and Chief Executive Officer.  Mitrow pled guilty pursuant to a plea agreement in

which the parties stipulated to certain aspects of the Sentencing Guidelines, but agreed to

disagree as to the appropriate loss amount, including based on relevant conduct.

　　The Government's position is that, including relevant conduct, Mitrow is responsible for

a loss between $1 million and $2.5 million, see U.S.S.G. § 2B1.1(b)(1)(I), yielding a 16-level

upward adjustment; Mitrow's is that the loss is between $200,000 and $400,000, yielding a

12-level adjustment, see id. § 2B1.1(b)(1)(G).  Using the Government's loss calculation,

Mitrow's Guidelines range as calculated in the plea agreement is 41–51 months' imprisonment;

using Mitrow's, the range is 27–33 months' imprisonment.[1]  Under the agreement, the

Government has agreed not to challenge a sentence of 27 months or more imprisonment; Mitrow

has agreed not to challenge a sentence of 51 months or less imprisonment.

Between June 29 and July 29, 2015, the Court conducted a five-day *Fatico* hearing to

resolve the loss adjustment.[2]  The Court heard testimony from 13 witnesses, including Mitrow,

and received numerous documentary exhibits.  After the hearing and closing argument, the Court

solicited post-hearing briefs, as to the loss calculation and other potential upward adjustments

which, the Court stated *sua sponte*, might apply based on the evidence at the hearing.  On August

24, 2015, the parties submitted those briefs.  Dkt. 164 ("Gov't Br."), 165 ("Mitrow Br.").

The Court rules as follows.  The Court finds an offense loss of $2,701,509.43, yielding an

18-level upward adjustment under U.S.S.G. § 2B1.1(b)(1)(J).  The Court does not find any other

adjustment beyond those agreed to by the parties.  However, the Court does identify here certain

facts established at the hearing that the Court expects to take into account at sentencing, pursuant

to 18 U.S.C. § 3553(a).

---

[1] In the plea agreement, the parties agreed that the base offense level is seven, *see* U.S.S.G. 2B1.1(a)(1), that a two-level increase is warranted because the offense involved sophisticated means, *see* U.S.S.G. § 2B1.1(b)(10)(C), and that—based on Mitrow's anticipated guilty plea and assuming non-disqualifying subsequent conduct—a three-level decrease is warranted for acceptance of responsibility, *see* U.S.S.G. § 3E1.1(a) & (b).  The Government thereby calculated the offense level as 22; Mitrow calculated it as 18.  Mitrow's criminal history category is I.

[2] The hearing was conducted on June 29 and 30, and July 1, 2, and 29, 2015.  The Court deferred the last day to enable the defense to call Mitrow's co-defendant and brother Matthew Mitrow to testify after Matthew's July 21, 2015 sentencing.  A *Fatico* hearing refers to *United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978).  "Tr." refers to the hearing transcript.

I.    **Loss Calculation**

    A.    **Overview of Mitrow's Fraudulent Activity**

In arguing that the loss was between $200,000 and $400,000, Mitrow claims that his criminal conduct was limited and that, for loss purposes, he is accountable for only a subset of that criminal conduct.

Specifically, Mitrow, through counsel, represented that the $200,000–$400,000 loss to which he stipulated reflected unspecified personal American Express charges that Mitrow caused Access to pay on his behalf, but for which he did not reimburse Access, including in October 2010, when, as part of a post-termination settlement, Mitrow paid Access $1.3 million to cover expenditures for his personal benefit for which he had caused Access to pay. Tr. 23–24.[3] The $200,000–$400,000 in unreimbursed charges, Mitrow's counsel argues, are the only basis on which a loss calculation may be based.

To be sure, Mitrow also admitted—and his guilty plea to Count Three was based on—his participation, between November 2008 and March 2009, in a separate fraudulent scheme directed at Access. The scheme was Mitrow's idea; he carried it out with John Rusinak, the owner of a charter jet travel company. Mitrow induced Rusinak to participate by telling Rusinak that Mitrow would otherwise not repay Rusinak the hundreds of thousands of dollars—possibly as much as $520,000—that he owed Rusinak for private jet travel that Rusinak had arranged and prepaid for Mitrow. Tr. 412–13. During the five-month scheme, Mitrow caused Rusinak to

---

[3] Asked the basis of the defense's calculation that Mitrow is responsible for a loss between $200,000 and $400,000, Mitrow's counsel stated: "My understanding is it's representing an acknowledgment that there is perhaps some loss from some of the AmEx charges that weren't repaid. But frankly, your Honor, I'm not sure that we can quantify those charges. Mike was willing to admit under oath that he didn't pay back all of the personal charges that were run through Access." Tr. 23–24.

submit eight fictitious invoices to Access.  Tr. 413–15, 422–23, 901–02.  These totaled $618,250.  The invoices, for consulting services ostensibly rendered to Access, were in the names of non-existent consulting companies: Stan Waterman, LLC; Rick O'Hanlon Consulting; Thomas Palmer Associates, Inc.; and Xalt Partners, LLC.  Tr. 421–22.  Rusinak prepared the invoices at Mitrow's direction:  Rusinak proposed names of fictitious consultants; Mitrow chose among them; Mitrow "spoonfe[]d" Rusinak the invoice content (*i.e.*, the description of the pharmaceutical marketing services the consultant ostensibly performed); and Rusinak forwarded the invoices to Mitrow, who forwarded them to Access.  Tr. 413–14, 705.  Believing the invoices valid, Access paid accordingly.  Tr. 415, 420.  Rusinak used Access's payments to reimburse himself for the charter jet travel that he had arranged and continued to arrange for Mitrow— travel for which Mitrow knew Access would not pay.  Tr. 704–05.  This included travel by Mitrow to resorts with his paramour, continuing an approximately nine-year (2001–2009) practice (Tr. 265–66, 270) in which Mitrow had caused Access to pay for roughly monthly private jet trips with the paramour to hotels in Mexico, Hawaii, Aspen, Jackson Hole, Manila, and elsewhere.

For sentencing purposes, however, Mitrow argues that the $618,250 that he fraudulently obtained under the Rusinak/false invoice scheme may not count towards loss.  As discussed at length *infra*, *see* pp. 11–19, this is largely on the ground that Mitrow confessed to this scheme to Access and later repaid Access the $618,250.  Mitrow denies any other crimes.  Mitrow testified that the false-invoice scheme involving Rusinak was aberrant.  He testified that in late 2008, he "lost sight, temporarily, [of] what was right and what was wrong.  And I became . . . I got greedy."  Tr. 705–06.  Mitrow's implication was that his conduct otherwise had been law-abiding.

The evidence at the hearing established otherwise.  It established far longer and more systematic fraudulent conduct on Mitrow's part.  It showed that, over a period of years, Mitrow used, opportunistically, a series of unlawful and fraudulent practices to extract personal benefit from Access.  The fraudulent practices were both similar and related—each picked up roughly where the previous one left off.[4]  Specifically:

1. ***Period leading to April 2007: Fraud on tax authorities involving unreported payment by Access of Mitrow's personal expenses***.  In the years before the April 2007 purchase of a controlling interest in Access by Monitor Clipper Partners ("MCP"), Mitrow, Access's founder, frequently charged personal expenses on Access's American Express card, including for private jet travel, resorts, and lavish personal items.  But he falsely coded many such charges as business expenses, thereby representing to Access personnel that the cost of such charges was properly borne by Access.  The effect of Access's payment of these personal charges was to defraud tax authorities because Access did not include Mitrow's personal expenses, to the extent coded as business expenses, within his reported income.  Tr. 642, 646, 657. In testimony, Mitrow claimed that, notwithstanding his coding these expenses as business, he believed at the time that Access's chief financial officer, David Gagliano, was independently reviewing Mitrow's expenses, determining which of the expenses Mitrow had coded as business were personal, overriding Mitrow's false coding, and including Mitrow's personal expenses among his taxable income.  Tr.

---

[4] Mitrow's acts and omissions underlying these sequential practices aimed at defrauding Access are relevant conduct to the Count Three offense of conviction.  *See* U.S.S.G. § 1B1.3.

644–47, 824, 832.  The Court rejects this claim, which was uncorroborated and implausible.  *See* Tr. 832–35.

2.  ***April 2007: Fraud on MCP involving Joseph Uzzolino.***  In the period leading to, and at the time of, MCP's purchase of a controlling interest in Access, Mitrow lied to MCP about his cousin Joseph Uzzolino's continuing business and financial relationship with Access; and developed a scheme to cover up from MCP Uzzolino's continuing role in and receipt of money from Access.  Mitrow's representation that Uzzolino had been removed from Access and had no ongoing role was material to MCP:  MCP's earlier talks with Access about buying an interest in Access had broken down as a result of MCP's discomfort with Uzzolino and his perceived associations, leading Mitrow to become frustrated and "very angry."  Tr. 53–55, 110–11, 160, 273, 289, 664–65; GX 13-1.  And MCP included in its acquisition agreement a term in which the Access signatories (including Mitrow) represented that Access "does not have any direct or indirect continuing business relationship" with Uzzolino or an affiliate, had not made any payments since January 1, 2007 to Uzzolino or an affiliate, and would not make any such payments in the future.  Tr. 56–61, 112; GX 26-1.  In fact, contrary to these representations, at Mitrow's direction, Access had arranged for Uzzolino to be hired and paid as a consultant of Creative Press, an Access direct-mailing vendor run by Mitrow's childhood friend Robert Madison.  Tr. 167, 669–71, 849–50, 905.  Between January 1, 2007, and April 20, 2007, Creative Press, using money funded by Access for this purpose, paid about $270,000 to Uzzolino.  Between April 2007 and February 2008, Creative Press, funded by Access, paid Uzzolino an additional $415,000.  Tr. 162–63, 166; GX 2-21–2-30.  The scheme

by which Access indirectly paid Uzzolino by routing payments through Creative Press was undisclosed to, and designed to be hidden from, MCP. Tr. 909–11, 1140–41. In two respects, it operated as a fraud on MCP. First, the false representation that Access had severed ties with Uzzolino induced MCP to buy a controlling interest in Access; MCP otherwise would not have done so. *See* Tr. 911–12; *see also* Tr. 915 (Mitrow admitting it was a "deliberate decision to keep from [MCP] the fact of the continuing relationship with Uzzolino"). Mitrow personally realized more than $20 million as a result of the sale to MCP. Tr. 848, 914. Second, Access was deprived of the $415,000 that it paid to Creative Press, after MCP's purchase, because these funds were paid on a false pretense, to wit, that they were for services rendered by Creative Press, and not to pay Uzzolino. *See, e.g.*, Tr. 913–14.

3. ***December 2007 through January 2009: Fraud on Access, involving kickback scheme, in which Madison, funded by Access, paid Mitrow's personal expenses.*** After MCP bought a controlling interest in Access, Access, per MCP policy, no longer paid for any travel on private jets. Between December 2007 and January 2009, entities controlled by Madison—Creative Press and East Coast Vending—made 15 payments for Mitrow's personal benefit, totaling $1,468,259.43. Eleven were for private jet travel by Mitrow, his family, and his paramour. Three (for $150,000, $236,000, and $40,000) were to Metler Enterprises, a limited liability company owned by Mitrow. *See* GX 28-5. One (for $100,000) was to an LLC controlled by Mitrow's paramour, *id.*; Mitrow caused Madison to pay that sum after Mitrow's paramour asked him to help her with a cash flow problem. Tr. 300–04; *see also* Tr. at 303 ("He told me that he would find a way to help me and . . . to not ask him where

the money came from.").[5]  Mitrow directed Madison as to the payees and amounts of

these checks; and acted within Access to expedite Access's payments to Creative

Press that enabled Creative Press to make such payments.  *See, e.g.*, Tr. 1072–74,

1020–21.  The funds used by Madison to pay these checks were available only on

account of the money Access paid to Creative Press.  Tr. 1020.  Madison pled guilty

to Count Two, charging a conspiracy to commit honest services fraud, based on this

kickback scheme.  He testified, credibly, that he made these payments for Mitrow's

benefit hoping to secure future business from Access, viewing them as "a cost of

doing business."  Tr. 980–81.

4.  ***November 2008 through March 2009: Fraud on Access, involving submission by***
***Rusinak of bogus consulting invoices used to pay Mitrow's personal expenses.***

Madison's companies last paid Mitrow's personal travel expenses in October 2008.[6]

Immediately thereafter, between November 2008 and March 2009, Mitrow initiated

the consulting-invoice scheme, causing Rusinak to submit, and Access to pay, the

bogus invoices totaling $618,250, thereby paying for Mitrow's private jet travel.

The issue before the Court is, therefore, how much, if any, each of these schemes adds to

the losses for which Mitrow is properly held accountable at sentencing, beyond the $200,000–

---

[5] Madison also paid more than $100,000 for Matthew Mitrow's personal expenses, including
$60,000 in home renovations, a $30,000 credit card bill, and a $19,000 bill at a New York City
gentlemen's club.  The Court does not include these figures in the loss amount attributable to
Michael Mitrow.

[6] The last such payment was made on October 16, 2008.  The three payments that Madison's
companies made for Mitrow's personal benefit after that date were to the LLC owned by
Mitrow's paramour (on November 19, 2008) and to the Mitrow-controlled Metler Enterprises
(on January 2, 2009 and January 28, 2009).  *See* GX 28-5.

$400,000 loss—which the Court treats as $200,000—to which Mitrow has stipulated based on unreimbursed personal expenditures paid by Access's credit card.

As to the first of these schemes, the *Fatico* hearing did not delve, in detail, into Access's payment of Mitrow's personal credit card expenses.  There was no tabulation that would enable the Court to determine the amount of such expenses for which Mitrow did not reimburse Access. And the Government has not sought to hold Mitrow accountable for credit-card expenses for which he did, eventually, reimburse Access.  On the record before it, the Court therefore does not find any loss—beyond the $200,000 admitted by Mitrow—arising from his use of Access's credit card to pay personal expenses.

The remaining three schemes, however, each properly give rise to a finding of additional loss.

### B.       Loss Calculation—Uzzolino ($415,000)

The Court finds a loss of $415,000, because Mitrow, using false pretenses, caused Access to pay that sum to Creative Press, which then used it to pay Uzzolino.  The evidence, including the testimony of MCP's Adam Doctoroff and the acquisition agreement, conclusively established that, following its purchase of a controlling interest in Access, MCP refused to pay any money to Uzzolino.  By routing the $415,000 to Uzzolino through Creative Press, on the false pretense that the money was to be for services rendered by Creative Press, and not to fund Uzzolino, Mitrow caused Access (and MCP) to be deprived of that sum.  The hearing record leaves no doubt that had Mitrow disclosed to MCP that $415,000 of the payments to Creative Press was earmarked for Uzzolino, MCP would have refused to pay that sum.

The Government argues that the $415,000 payment should give rise to yet a greater loss tabulation ($2.075 million), because the acquisition agreement provided for a 5-times penalty to

be paid to MCP with respect to any sum which the "new" (*i.e.*, post-acquisition) Access paid to Uzzolino.  *See* GX 26-1, at 32–33.  The Court declines to find such a loss.  While this liquidated damages provision would support such a damages award in a civil suit, it is not relevant to the Guidelines calculation, which defines loss as the higher of intended or actual loss, and defines "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense."  *See* U.S.S.G. § 2B1.1, Application Note 3(A) and 3(A)(i); *see also id.*, Application Note 3(A)(iii) ("'Pecuniary harm' means harm that is monetary or that otherwise is readily measurable in money.").  Here, the pecuniary harm to Access and MCP is the out-of-pocket loss occasioned by Access's payment on false pretenses of $415,000 to Uzzolino.

A separate loss question is presented by the deliberate hiding from MCP, in connection with the MCP acquisition, of (1) Access's ongoing relationship with Uzzolino, and (2) the $270,000 paid to Uzzolino by Access (via Creative Press) in the three months before the acquisition.  The Court has no difficulty concluding that Mitrow's fraudulent concealment of these facts—and his false denial of them in the acquisition agreement—caused MCP to go forward with the purchase.  But to determine the loss thereby caused to MCP, the Court would need to determine whether the stake that MCP bought in Access was less valuable as a result of the company's affiliation with Uzzolino, and if so, how much less valuable.  The record before the Court, although establishing MCP's strong subjective aversion to Uzzolino, does not permit the Court to make that assessment.  There is no non-speculative basis on which the Court could assign a lesser value to Access on account of its continuing ties to Uzzolino.  To be sure, the Guidelines do permit a defendant's gain to be used "as an alternative measure of loss [] if there is a loss but it reasonably cannot be determined."  U.S.S.G. § 2B1.1, Application Note 3(B).  But the Court declines to do so here because it would yield a misleading result:  Mitrow's gain (more

10

than $20 million) from the sale of his stake in Access to MCP would substantially overstate any realistic measure of the loss his falsehoods about Uzzolino caused MCP.

The Court, therefore, does not find any incremental loss attributable to Mitrow's false pre-acquisition representations to MCP to the effect that all ties to Uzzolino had been severed. That said, considered not in Guidelines loss terms but in light of the broader factors relevant to sentencing under 18 U.S.C. § 3553(a), the fact that Mitrow schemed to dissemble to MCP to induce it to pay him and Access's other partners millions of dollars for an ownership stake in the company is relevant to sentencing. It bears, negatively, upon "the nature and circumstances of the offense and the history and characteristics of [Mitrow]." 18 U.S.C. § 3553(a)(1). The Court will take this conduct into account in determining the appropriate sentence.

### C. Loss Calculation—False-Invoice Scheme ($618,250)

The scheme in which Mitrow caused Ruzinak to submit invoices to Access for consulting services purportedly rendered by fictitious companies was, by any measure, a blatant fraud that cost Access $618,250. Mitrow, however, advances two arguments why this sum is not countable towards loss.

#### 1. Jet Travel for Business Purposes

At the *Fatico* hearing, Mitrow argued that the money obtained from the invoice scheme should not count towards loss to the extent (if any) that the private jet travel which it funded was for business, as opposed to personal, purposes. This argument (which Mitrow abandons is his post-hearing brief) is quickly put to one side.

The evidence was uniform that MCP, which controlled Access beginning in April 2007, would and did not pay for business travel on private jets. MCP's Doctoroff credibly testified, without contradiction, that Access adhered to a policy against ever paying for private jet travel.

Tr. 79–81, 131.  There was good reason for this policy.  The evidence revealed the extraordinary cost of chartering private jets, relative to flying, say, business or even first-class on commercial flights.[7]  And, of course, had Access been willing to pay for such travel, there would have been no reason for Mitrow, to the extent the trips at issue had a business purpose, to go to lengths to have the bogus invoices created.  Rusinak could have submitted a truthful invoice for them.  Mitrow, in fact, admitted that the reason he submitted the false invoices was because he "knew that I wanted to continuing flying on these jets, and I was pretty confident that Monitor Clipper Partners was not going to allow for the private jet travel to happen anywhere through the company."  Tr. 704–05; *see also id.* Tr. 714 ("I also thought it was possible that they may not pay, and then I would not be able to use the private jets for business travel.").

## 2.  Confession and Eventual Repayment

Mitrow argues that, because he eventually admitted the false-invoice scheme and paid Access $618,250 as part of a civil settlement, this sum should not count towards loss under the Guidelines.  The pertinent Guidelines provisions are as follows.  "Loss" is defined as "the greater of actual loss or intended loss."  US.S.G. § 2B1.1, Application Note 3.  But such loss is to be reduced—*i.e.*, a credit against loss is to be applied—for:

> The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.  The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

---

[7] The private jet bills in the record reflect, among many other such flights, a $65,107.91 one-way flight from New Jersey to Costa Rica, *see* GX 15-44, along with a virtually identically priced return flight, *see* GX 15-45; an $83,829.87 round-trip from San Diego to New Jersey, *see* GX 15-122; a $64,716.50 round-trip from New Jersey to Florida, *see* GX 15-4; and a $57,892.74 one-way flight from New Jersey to Colorado, *see* GX 15-133.

U.S.S.G. § 2B1.1, Application Note 3(e)(1).

Mitrow's argument here is based on the fact that in June 2009, before the false-invoice scheme was known to MCP, he confessed it (and his having caused Access to pay certain of his personal expenses) to MCP; and that in September 2010, after his termination and as part of the settlement of a civil lawsuit brought by Access, he paid Access $1.3 million, which covered the $618,250 (along with personal expenses he had charged to Access's credit card). Mitrow argues that his disclosure and repayment qualifies him for the credit under Application Note 3(e)(1). Mitrow Br. 23–24.

For two independent reasons, the Court rejects Mitrow's claim of entitlement to a credit against loss under Application Note 3(e)(1).

*First*, and most important, the hearing evidence overwhelmingly establishes that at the time that Mitrow revealed the bogus Rusinak invoices to MCP, he "knew or reasonably should have known that the offense was . . . about to be detected by a victim." Application Note 3(e)(1). And it refutes Mitrow's contrary claim that he was impelled to confess by internal forces, such as gnawing guilt or an epiphany about his wrongful conduct.

Specifically, at the time Mitrow confessed, Access's primary client, Pfizer, was engaged in a substantial audit of Access, assisted by Navigant Consulting, Inc. The audit was focused on payments Access had made to consultants, and entertainment and gifts that Access had given to, among others, Pfizer employees; Pfizer ultimately terminated its relationship with Access as a result of the audit. Tr. 66, 308, 856–60. Two of the bogus Rusinak consulting invoices, in fact, expressly identified Pfizer as the bogus consultant's purported client. *See* DX 1-C at AC001391 (invoice from Thomas Palmer Associates, Inc. to Access for "Business Development Consulting: Pfizer – Zyvox Project, $69,150," dated 11/23/2008); *id.* at AC001393 (invoice from Stan

13

Waterman, LLC to Access for "Consulting: Medical Education and Marketing; **Project: Pfizer – Lipitor**, $73,200," dated 1/19/2009) (emphasis in original); *see also* Tr. 414. It stood to reason that in the course of Pfizer's audit and/or in the course of independent investigation by MCP triggered by the audit, the false consulting-invoice scheme would come to light.

To be sure, because Mitrow (through criminal defense counsel) confessed the consulting-invoice fraud to MCP in June 2009, it cannot be known with certainty that or when MCP would have discovered it. But Mitrow's statements and actions at the time leave the Court with no doubt that Mitrow, the person in the best position to make this assessment, had concluded that the scheme would soon come to light, and that his confession was an act of damage control.

The testimony of Mitrow's paramour, which the Court credits, was probative on this point. She testified that, at the outset of the audit, Mitrow told the Access partners, including her, "that he was worried about the audit" and "expressed that he would have to come clean with Monitor Clipper on some things that would pop up from the audit." Tr. 309. Around the same time, the paramour testified, Mitrow "lost an extraordinary amount of weight." Tr. 309. Mitrow also told the paramour that he feared that MCP would "prosecute him"; he said he was "losing sleep" and "not eating over this and . . . it was really eating him alive" and that he "was going to have to come forward." Tr. 350–51. Mitrow told his paramour that his concern was not just what Pfizer would learn but also about MCP's "discovering information that could cause them to prompt a prosecution." Tr. 351. Mitrow also told his paramour "that what he was worried about was private jet travel. That was going to come out of the audit." Tr. 311. That Mitrow's confession to the false-invoice scheme was strategic and driven by his expectation that the scheme would soon be uncovered—as opposed to by a desire to make a clean breast of his

wrongdoing—is further confirmed by his statement to his paramour after his confession.  "At least," Mitrow told her, "they didn't find any invoices from Creative Press."  Tr. 312.

The testimony on this point of Mitrow's cousin, Uzzolino, was in broad accord.  Crying and emotional, Mitrow told Uzzolino that he "got caught misusing money" on "airplanes[,] parties and jewelry" and that "I got caught.  I got fired."  Tr. 168–69.  Uzzolino recalled Mitrow as voicing concern about "getting locked up and going to jail."  Tr. 173.[8]  Mitrow's admission that he had gotten "caught" is consistent with the audit having forced his hand.  It is not consistent with Mitrow's having confessed free of such pressure.

Tellingly, Mitrow, questioned by the Court at the hearing, admitted that he believed at the time that Pfizer could uncover the bogus Rusinak invoices during its audit and report the fraud to MCP, leading to a referral to the government:

> **THE COURT**:  Did you believe that as a result of the audit that was forthcoming, Monitor Clipper could learn that it had received invoices from fake entities to pay expenses for your benefit?
>
> **MITROW**:  Yes.
>
> **THE COURT**:  Did you believe that Monitor Clipper, alerted that it had paid an invoice to the make-believe Stan Waterman, might conclude that it had been defrauded out [of] the $40,000 paid on that invoice?
>
> **MITROW**:  Yes.
>
> **THE COURT**:  Same for the other Rusinak invoices?
>
> **MITROW**:  Yes.

---

[8] Uzzolino accurately recalled that Mitrow's admissions to this effect took place in the spring. He wrongly recalled the year as 2008, not 2009.  Tr. 168–69.  Consistent with Uzzolino's account of Mitrow's affect, MCP's Doctoroff recalled Mitrow as "very emotional" and "either in tears or nearly in tears" when he admitted his "mistake."  Tr. 76.

Tr. 734; *see also* Tr. 750; Tr. 730–31 (admitting, when questioned by the Court, that "I wasn't sure if they [Pfizer] was going to uncover them or not, but it certainly was a concern," and acknowledging that Pfizer could report its findings to MCP, which could conclude it had been defrauded and report the fraud to the government).

To be sure, Mitrow gave contrary testimony.  On direct examination by his counsel, Mitrow stated that he had confessed because "I just couldn't deal with what I did any longer. . . . I just couldn't handle the pressure anymore.  It just was eating me alive."  Tr. 726–28.  He stated that he had been unconcerned about prosecution, that it never "crossed [his] mind" that he "might be prosecuted," and that he had been instead concerned "[t]hat [he] was going to lose [his] job" and that he wanted "to come clean."  Tr. 732, 735, 736.  Based on this testimony, Mitrow's counsel argued that Mitrow confessed simply because he "wanted to unburden his conscience."  Mitrow Br. 27.

The Court rejects this self-serving testimony as incredible.  As noted, it is inconsistent with other witnesses' testimony, particularly that of Mitrow's paramour, and contradicted by Mitrow himself.

It is also totally implausible in light of Mitrow's overall pattern of behavior.  As reviewed above, Mitrow for years engaged in audacious and interrelated frauds, all aimed at enriching himself and facilitating, at others' expense, a lavish lifestyle.  The victims of these acts included tax authorities, Access, and MCP.  Before June 2009, Mitrow had not confessed any misdeed to any of these victims.  And the record supplies no basis on which to conclude that in spring 2009, Mitrow, unprompted by fear of detection, had a sudden epiphany or crisis of conscience.  Indeed, it supplies no basis to view Mitrow as having a well-honed sense of right and wrong at all, let alone one that moved him, unbidden, to confess the false-invoice fraud in spring 2009.  Having

observed and questioned Mitrow, the Court found this claim to have acted out of conscience contrived, rehearsed, and false.  (Tellingly, Mitrow repeated the phrases "I just couldn't deal with it any more" and "It was eating me alive" in response to multiple questions.)

Mitrow's transparent goal in claiming at the hearing to have acted out of conscience was to prevent the $618,250 he obtained from the invoice fraud from being added to his sentencing loss.  But the evidence was overwhelming that Mitrow, and the counsel who confessed the fraud on his behalf to MCP in June 2009, did so to limit the damage to Mitrow that would flow from the discovery of his defalcations.  There was a likelihood that his misdeeds, including the blatantly criminal false-invoice scheme, would come to light, given the ongoing audit. Confessing was a strategic—albeit ultimately unsuccessful—attempt to minimize the risks of termination and referral for prosecution that Mitrow faced.

As the case law applying Application Note 3(e)(1) confirms, where a defendant admits a crime prompted by a fear of coming detection, there is no credit against loss.  *See, e.g.*, *United States v. Rhodes*, 410 F. App'x 856, 861–62 (6th Cir. 2010) (unpublished) (upholding denial of loss credit where, before repayment, victim confronted defendant about suspicion of wrongdoing and informed defendant that "he was going to conduct a further audit of the books"); *see also United States v. Philpot*, 733 F.3d 734, 748–49 (7th Cir. 2013) (upholding denial of loss credit to county clerk, who returned $25,000 in stolen federal funds; given media coverage, "Philpot should have known that government investigators might soon become aware of his conduct"); *United States v. Nichols*, 229 F.3d 975, 979 (10th Cir. 2000) ("It is not error for a district court to count the full amount taken through fraud as an intended loss, where the victim recovers the loss through a civil suit, as opposed to through any voluntary action on the part of the defendant.") (citing *United States v. Burridge*, 191 F.3d 1297, 1301 (10th Cir. 1999); *United States v.*

*Pappert*, 112 F.3d 1073, 1079 (10th Cir. 1997)); *cf. United States v. Maisonet-Gonzalez*, 785

F.3d 757, 763 (1st Cir. 2015) (denying loss credit where defendant returned money to victim

through a civil settlement).  Such is the case here.  Mitrow is not entitled to zero out the

$618,250 loss caused by his false-invoice scheme.

      *Second*, Mitrow did not pay back the money to MCP in June 2009, when he confessed.

He did so only 16 months later, after extensive negotiations with MCP and after MCP had filed a

civil lawsuit against him.  Tr. 141–44.  The text of Application Note 3(e)(1), however, requires

that, to receive a credit against loss, the defendant have "returned the money" before detection of

the offense.  MCP was aware of the Ruzinak offense long before September 2010—Mitrow

confessed to it and MCP thereupon investigated.

      Through counsel, Mitrow argues that it was "impossible" to repay the $618,250 earlier,

*see* Mitrow Br. 23; he states that he "could not have returned the money without an explanation,"

that "providing a full explanation was a lengthy process," *id.* 23–24, and that it took a long

period for Access, MCP, and Mitrow to negotiate a settlement.  There is, however, no evidence

supporting Mitrow's suggestion that MCP would have—let alone told Mitrow that it would

have—turned away a unilateral return by Mitrow of the fraud proceeds in June 2009.

      The evidence to which Mitrow points supports a different point: that a settlement with

MCP, with a release and closure for Mitrow, was not possible in June 2009 because, as MCP's

Doctoroff testified, MCP insisted upon undertaking its own investigation, aided by an outside

forensic accountant.  *See, e.g.*, Tr. 90, 141–42.  But nothing prevented Mitrow at the time he

confessed from repaying MCP the money he had obtained by fraud, to which Mitrow had no

conceivable claim of right.  Nothing required Mitrow to defer returning these ill-gotten gains

until a global settlement and release had been negotiated.  It was, of course, Mitrow's prerogative

not to unilaterally repay MCP the $618,250, and instead to await a global settlement; perhaps he believed that waiting gave him settlement leverage.  But actions have consequences.  Although Mitrow's eventual payment of $1.3 million to Access after it sued him was a constructive act that (relative to a refusal to repay) reflects favorably on Mitrow and is relevant under § 3553(a), his failure to repay this money until 16 months after MCP learned of his fraud disqualifies him from the loss credit for "moneys returned" under Application Note 3(e)(1).  *See, e.g.*, *Maisonet-Gonzalez*, 785 F.3d at 763; *Nichols*, 229 F.3d at 979; *United States v. Janusz*, 135 F.3d 1319, 1324 (10th Cir. 1998); *United States v. Mau*, 45 F.3d 212, 216 (7th Cir. 1995); *United States v. Mummert*, 34 F.3d 201, 204 (3d Cir. 1994).

The Court, accordingly, finds an additional loss of $618,250 based on the false invoice scheme.

### D.   Loss Calculation—Kickbacks Paid by Madison Entities ($1,468,259.43)

During a 17-month period after MCP had bought a controlling interest in Access, Madison's two companies (Creative Press and East Coast Vending) paid $1,468,259.43 in personal expenses for Mitrow's personal benefit.  These expenses largely covered private jet travel to resort locations for Mitrow and his paramour (or sometimes, Mitrow and his family). Madison also made three payments totaling $426,000 to Metler Enterprises, an LLC controlled by Mitrow that covered expenses relating to Mitrow's condominium and his boats, Tr. 743–45, 872–73, and $100,000 to an LLC controlled by Mitrow's paramour, Tr. 302–03.  At the time of these payments, Creative Press was a major Access vendor:  Between 2001 and 2009, it was retained by Access to print marketing materials and mail those materials to labor union members and their physicians, on behalf of Access (and its pharmaceutical clients).  Between 2004 and

2009, Access paid Creative Press approximately $7.6 million for its services and was the source of the "vast majority" of Creative Press's business.  Tr. 1009.

Both Mitrow and Madison were charged in Count Two with participating in a conspiracy to commit honest services fraud, alleging that Madison had made kickback payments to benefit Mitrow that properly belonged to Access.  Madison pled guilty to that charge, GX 28-9, but Mitrow did not.  In the *Fatico* hearing, the Government sought to hold Mitrow accountable for this conduct.

In *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) (en banc), the Second Circuit addressed violations of the honest services statute that take the form of private-sector kickback or self-dealing schemes.  The Court stated:

> The phrase "scheme or artifice [to defraud] by depriv[ing] another of the intangible right of honest services," in the private sector context, means a scheme or artifice to use the mails or wires to enable an officer or employee of a private entity (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers) purporting to act for and in the interests of his or her employer (or of the other person to whom the duty of loyalty is owed) secretly to act in his or her or the defendant's own interests instead, accompanied by a material misrepresentation made or omission of information disclosed to the employer or other person.

*Id.* at 146–47.  Describing bribery and kickback cases in particular, the Second Circuit stated: "In the[se] cases, a defendant who has or seeks some sort of business relationship or transaction with the victim secretly pays the victim's employee (or causes such a payment to be made) in exchange for favored treatment."  *Id.* at 139; *see also, e.g.*, *United States v. Bahel*, 662 F.3d 610, 634 (2d Cir. 2011) ("In *Skilling*, the Supreme Court defined classic kickbacks as involving the receipt of something of value from a third party '*in exchange for*' official action.") (quoting *Skilling v. United States*, 561 U.S. 358, 413 (2010)) (emphasis in *Bahel*); *United States v. DeMizio*, 741 F.3d 373, 381 (2d Cir. 2014) ("A kickback scheme typically involves an

employee's steering business of his employer to a third party in exchange for a share of the third party's profits on that business.") (citing Black's Law Dictionary 948 (9th ed. 2009) (defining "kickback" as the "return of a portion of a monetary sum received, esp. as a result of coercion or a secret agreement")); *cf.* 41 U.S.C. § 8701(2) ("The term 'kickback' means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind that is provided to [enumerated persons] to improperly obtain or reward favorable treatment in connection with [enumerated circumstances].") (cited favorably in *Skilling*, 561 U.S. at 412–13).

The evidence convincingly established that, consistent with Madison's guilty plea, the nearly $1.5 million that he paid to personally benefit Mitrow were kickbacks. Indeed, they were classic kickbacks. Creative Press was a small business. Access was, far and away, its largest source of business. Madison would not have been able to pay nearly $1.5 million to personally benefit Mitrow were it not for the business Access had given to Creative Press. *See* Tr. 1020 (Madison testimony that the money used to pay Mitrow's expenses "was essentially ultimately derived from payments Access had previously paid" to Creative Press). Indeed, in 2008, when Creative Press and East Coast Vending paid more than $1 million on Mitrow's behalf, Madison, the sole owner of those companies, made combined K-1 income from those entities of just $284,442. Tr. 1011; GX 1-2.

The evidence further established that Mitrow instigated Madison's payments. Madison testified that he made the payments to benefit Mitrow at Mitrow's request (and at least once, at the request of another Access employee, Mike Webster). Tr. 1009–11. Madison also testified that Mitrow notified him to whom and in what amount the checks were to be made. *See, e.g.*, Tr. 1019. Mitrow also took steps within Access to prioritize and expedite Access's payments to Creative Press. Tr. 1072–74. Madison's accountant, Michael Siggins, testified that, upon

payment by Access, Creative Press made "instantaneous reimbursement"—*i.e.*, instantaneous payment of Mitrow's private jet travel expenses.  Tr. 256–57.  The evidence thus makes unavoidably clear that Madison was but a way-station:  The money he used to fund Mitrow's lifestyle had come from Access, and it stayed with Madison only briefly before being spent on Mitrow's desires.

Significantly, Madison testified that his motivation for paying Mitrow's private jet travel, condominium, boat, and paramour expenses was to secure business from Access.  He described the payments as "a cost of doing business to help me get more business," Tr. 980–81, adding that "I believed if I paid for the jets, I'd get more business."  Tr. 981; *see also* Tr. 1014 (Madison testimony that he believed that paying Mitrow's personal expenses might result "in millions of dollars of business for years to come").  To be sure, Madison denied subjectively fearing that he might lose business from Access if he spurned Mitrow's requests for payment of his personal expenses.  He also denied that Mitrow had ever used the word "kickback."  Tr. 990, 1007.  And Mitrow similarly testified.  Tr. 885.  But any rational business owner in Madison's position would have to have feared a loss of business.  Madison was dependent on Access.  Access was Creative Press's biggest source of business, by far.  And the person asking that Creative Press pay his jet travel and other expenses was Access's President and CEO.[9]

Under these circumstances, Madison's motivation for paying the vast expenses that his friend Mitrow asked him to cover was transparent—to secure future business from Access.  And

---

[9] Notably, Mitrow concealed from Madison that the private jet travel was largely for personal use—Madison believed the travel was for business purposes only.  Had he known of the personal nature of Mitrow's trips, Madison testified, he would have been "very hesitant" to pay for them.  Tr. 998–99.

Mitrow's undisclosed solicitation and receipt of large sums for his benefit from Access's vendor Madison was a blatant breach of his duty of loyalty to Access and its other owners.

Effectively, Access, by funding Madison's companies, was funding Madison's payments to benefit Mitrow—and the "instantaneous reimbursement" of Mitrow by Madison's companies upon payment by Access made this apparent. If Access's payments to Creative Press for its services were large enough to permit Madison to pay nearly $1.5 million over 17 months to benefit Mitrow and still turn a profit on his work for Access, then Mitrow's patent duty to Access and its other owners, as Access's top executive, was to capture that money for Access, not cause Madison secretly to steer it to Mitrow himself. Mitrow's solicitation from a vendor and retention of money that had just recently been Access's breached this duty. *See generally United States v. Nouri*, 711 F.3d 129, 137 n.1 (2d Cir.) ("The 'existence of a fiduciary relationship' between an employee and employer is 'beyond dispute,' and the violation of that duty through the employee's participation in a . . . kickback scheme is within the core of actions criminalized by § 1346.") (quoting *Skilling*, 561 U.S. at 407 & n.41), *cert. denied sub nom. Martin v. United States*, 134 S. Ct. 309 (2013); *Rybicki*, 287 F.3d at 261.

Mitrow, in contesting that the money he (and his LLC and paramour) received were kickbacks, makes several arguments.

Primarily, Mitrow characterizes Madison's payments benefiting him as routine business development expenses. *See* Tr. 692 (Mitrow testimony that he viewed Madison as "a vendor entertaining their client"). The evidence refutes, and the Court rejects, that claim. Madison's nearly $1.5 million in payments to fund Mitrow's lavish lifestyle hardly resembled ordinary entertainment by a service provider of a client. The money Madison paid did not fund his meals with, or his entertainment of, a client executive. Madison and his companies served instead as

the source of a "slush fund" to pay private expenses of Mitrow's that Mitrow preferred not incur himself—*i.e.*, for resort travel with his paramour and for upkeep of Mitrow's condominium and boats—and that Mitrow could no longer induce MCP-owned Access to pay itself.  Revealingly, Madison did not participate in Mitrow's private jet travel.

Relatedly, Mitrow likens Madison's payments to Access's lavish entertaining of its clients, such as Pfizer, during the same period.  Tr. 694; *see also* Tr. 36 (argument by Mitrow's counsel that "[t]his isn't any different than Access entertaining Pfizer").  But, as the evidence reflected, Access's client-entertainment payments were on a far lesser scale, relative to the size of its business, than was Creative Press's funding of Mitrow:  An $80 million business with 225 employees, Access had an annual client-entertainment expenditure of $2.5 million.  Tr. 775–76. And the circumstances of Access's client entertainment, to the extent developed at the hearing, were of quite a different character than Madison's supposed "entertainment" of Mitrow.  There was no evidence that Access's entertainment of Pfizer executives was surreptitiously funded by immediately preceding payments from Pfizer itself.  Nor was there evidence that Access's entertainment of Pfizer executives entailed paying for their private jet vacations with families or paramours or for their condominium and/or boat expenses, or making payments to paramours' LLCs.  Whatever client development excesses occurred at Access were a far cry, in scale and nature, from those here.[10]  And in any event, it goes without saying, Access's practices are not the measure of legality.

---

[10] Mitrow's claim to have viewed Madison's payments for his benefit as unexceptional client entertainment is, further, undermined by his statement of relief to his paramour after the MCP audit:  "At least they didn't find any invoices from Creative Press."  Tr. 312.  This statement evinces Mitrow's consciousness of wrongdoing with respect to this practice.

Mitrow also contests certain factual claims by the Government regarding the kickback scheme. Most notably, the Government alleged that Creative Press did not do certain print jobs or mailings expected of it by Access; Madison testified that foregoing mailings helped him free up money used to pay Mitrow's expenses. Tr. 959–62, 985–88. Mitrow, however, argues that he did not know that Madison had skimped on any work, and that he and Access had an interest in Creative Press's full performance, lest the Access client (Pfizer) for whose benefit Creative Press worked be dissatisfied. On this discrete point, the Court sides with Mitrow. Whether or not Madison shirked some mailings, the evidence did not establish that Mitrow knew, or suspected, such under-performance. But this point does not undermine the finding of a kickback. A kickback scheme does not require that the funds used to pay the kickbacks themselves have been procured by an independent fraud or criminal act. And, in any event, Madison testified that the money he paid to benefit Mitrow came partly from foregone work and partly out of his profit margin. Tr. 999–1000, 1020.

Mitrow also notes that the evidence showed that it was not he, but his cousin, Uzzolino, who chose Creative Press as an Access vendor. But the origins of that business relationship do not undermine the finding of a kickback scheme. As Access's President and CEO, Mitrow was in position to affect the company's choice of vendor. It is reasonable to infer, and the Court does infer, that when Access continued to send ample business to Creative Press during 2007 and 2008, it was with Mitrow's support.

Mitrow's final argument is there was no evidence of an explicit *quid pro quo* between Madison and Mitrow. But an express arrangement is not required for a kickback scheme, any more than an express agreement is required for a conspiracy. *See, e.g.*, *United States v. Garrido*, 713 F.3d 985, 997 (9th Cir. 2013) ("an implied *quid pro quo*" is sufficient for a "Section 1346

honest services conviction on a bribery theory") (citing *United States v. Kincaid-Chauncey*, 556 F.3d 923, 943 (9th Cir. 2009)), *cert. denied sub nom. Robles v. United States*, 134 S. Ct. 1333 (2014); *United States v. Wright*, 665 F.3d 560, 568 (3d Cir. 2012), *as amended* (Feb. 7, 2012) (in honest services fraud prosecution, "[t]he intent of both parties may be inferred from circumstantial evidence. 'The *quid pro quo* can be implicit . . . .'") (quoting *United States v. Antico*, 275 F.3d 245, 257 (3d Cir. 2001)); *United States v. Urciuoli*, 613 F.3d 11, 13, 15 n.3 (1st Cir. 2010) (*quid pro quo* bribe need not be evidenced by any express agreement or statements of intent). The evidence here supports, and the Court finds, that (1) Madison agreed to pay nearly $1.5 million of Mitrow's personal expenses with both men understanding that his goal was to obtain favorable treatment (future business) from Access, and (2) Mitrow solicited and received such benefits well aware that Madison's purpose in paying vast sums for his benefit was to obtain future business from Access.

The Court, accordingly, finds that the $1,468,259.43 that Madison caused his companies to pay for Mitrow's benefit were kickbacks. In soliciting and secretly receiving them from an Access vendor, Mitrow took advantage of Madison's dependence on Access and breached his duty of loyalty to Access.

### E.   Aggregate Loss Calculation

The Court, accordingly, arrives at an overall loss calculation of $2,701,509.43—the total of (1) the $200,000 in unreimbursed personal credit-card expenses that Mitrow has conceded, (2) the $415,000 fraudulently diverted to Uzzolino following MCP's purchase; (3) the $618,250 obtained by Mitrow by means of the Ruzinak false-invoice scheme; and (4) the $1,468,259.43 in kickbacks paid by Madison.

Pursuant to U.S.S.G. § 2B1.1(b)(1)(J), such a loss results in an upward adjustment for loss of 18. Mitrow's overall adjusted offense level is therefore 24, corresponding to Guidelines range of 51–63 months imprisonment.

## II.    Other Issues Raised by the Court

At the close of the hearing, the Court invited briefing on two Guideline issues not raised by the parties: whether (1) an upward adjustment for an aggravating role in the offense was merited, *see* U.S.S.G. § 3B1.1, and (2) Mitrow's hearing testimony called into question his entitlement to a credit for acceptance of responsibility, *see id.* § 3E1.1, or merited an upward adjustment for obstruction of justice, *see id.* § 3C1.1.

### A.    Adjustment for Aggravating Role

The Court's judgment is that the facts do not justify an aggravating role enhancement. To be sure, the Court finds, Mitrow did draw three others into discrete aspects of his fraudulent activity: Rusinak, Madison, and his paramour. But for § 3B1.1(a) to apply, a criminal scheme must have had "five or more participants" or have been "otherwise extensive." U.S.S.G. § 3B1.1(a) (four-level adjustment).[11]

Whether U.S.S.G. § 3B1.1(c) applies presents a closer question, in that it provides for a two-level "organizer" or "leader" role adjustment for offenses involving fewer participants or which were not "otherwise extensive." The Court finds this adjustment inapplicable because the fraudulent conduct here, in a real sense, was predominantly for Mitrow's benefit alone, and those who facilitated it, save Madison, were minor and reluctant and/or non-culpable participants. As

---

[11] Although Mitrow's brother pled guilty to a tax offense, the record does not support that Matthew Mitrow was a knowing participant in a Title 18 fraud or, for that matter, that his tax offense was in coordination with his brother.

to Rusinak, a small-business owner who in 2008 relied on Mitrow for more than half of his business, Tr. 379, the evidence showed that Mitrow coerced him to submit the invoices:  Mitrow led Rusinak to understand that if he did not submit them, he would have to write off the large sums due him as "bad debt."  Tr. 413, 416, 902–03.  As to Mitrow's paramour, the record does not establish her criminal intent:  Although her LLC received $100,000 from a Madison entity, she did not know the circumstances leading to this payment.  The Government did not prosecute Rusinak or the paramour, but entered into a non-prosecution agreement with each, *see* Tr. 318, 463, and does not pursue a role adjustment as to Mitrow.

However, the parties are advised that the Court regards Mitrow's enlistment and exploitation of others to further his fraudulent activity, as established at the hearing, as factors reflecting negatively on Mitrow, as to both "the nature and circumstances of the offense" and "the history and characteristics of the defendant."  18 U.S.C. § 3553(a).  The Court expects to consider these factors at sentencing.

### B.      Obstruction and Acceptance Adjustments

Having reviewed and carefully considered Mitrow's testimony, the Court's judgment is that several aspects of this testimony were unworthy of belief.  This testimony included:

(1)  That Mitrow believed at the time that Access CFO David Gagliano was reviewing and reversing the credit-card expenses that CEO Mitrow had falsely denoted as business expenses and reporting those among Mitrow's income from Access, Tr. 644–45;

(2)  That it was purely a "coincidence" that the Rusinak false-invoice scheme started when Mitrow's use of Creative Press to pay for his jet travel stopped, Tr. 708;

(3)  That Mitrow did not understand that MCP had a policy against paying for private jet travel, and that "[i]t just never occurred to me to ask," Tr. 713–14; and, as noted,

(4) That Mitrow confessed the false-invoice scheme to MCP on his own initiative, not believing it was likely to be discovered, and that he "wasn't concerned about criminal prosecution" and that it never "crossed [his] mind" that he "might be prosecuted."  Tr. 727, 735.

The Court's determination is Mitrow's testimony as to each of these points was knowingly false, and that Mitrow so testified in an attempt to minimize his sentencing exposure.

As with the aggravating role adjustment, the Court narrowly determines not to impose an obstruction of justice adjustment based on this testimony, or to deny Mitrow from acceptance of responsibility credit on account of it.  The statements in question, to some degree, pertained to collateral matters.  The Court is mindful that in the same testimony, Mitrow admitted serious crimes: the Rusinak false-invoice scheme and causing Access to pay personal expenses through the company's American Express card.  And Mitrow's guilty plea, to both wire fraud and tax evasion, undeniably saved the parties, and the Court, resources.  Significantly, the Government, while arguing that Mitrow's testimony on the first two points was knowingly false, does not contend that this testimony merits an obstruction adjustment or denial of credit for accepting responsibility.  That said, the Court will take this false testimony into account at sentencing, as relevant to the Court's analysis under § 3553(a).

The Government does pursue an obstruction enhancement on a separate basis: Mitrow's having surreptitiously audiotaped conversations with co-defendant Madison on eight occasions, including after Madison's guilty plea, and including while the two were party to a joint defense agreement.  The Court, after close review, declines to impose such an adjustment.

Although manipulative and underhanded, antithetical to (at a minimum) the spirit of a joint defense arrangement, and admittedly designed to circumvent ethical rules that prevented his

counsel from engaging in such tape-recording,[12] Mitrow's tape-recording of Robert Madison was not unlawful.  And Mitrow on the tapes did not engage in improper conduct.  Although Madison was concerned about this possible ramification, Tr. 972, Mitrow did not, for example, imply that he might abandon his promise to pay Madison's legal and travel fees if Madison gave an unwanted answer to Mitrow's factual questions about the kickback scheme, then or in later testimony.  The Court is, however, prepared to take Mitrow's tape-recording of Madison into consideration at sentencing, and invites the parties to address whether, and if so how, this behavior bears on Mitrow's "history and characteristics" under § 3553(a).

As a final note on this point, the Court observes that Madison's responses to Mitrow's questions had limited, if any, probative value.  Mitrow's questions were leading and hamhanded.  And on the tapes, Madison was quite evidently "yessing" Mitrow, as Madison explained in his testimony at the hearing.  Tr. 972 ("I feel like I needed to say whatever I needed to to appease Mike so that my legal fees and my travel continued to be paid . . . .  So it was very important to me to keep Mike at bay and happy.").  And Madison's statements on the tapes, which the Court has carefully reviewed, do not call into question the facts, reviewed above, on which it has relied in finding that Mitrow and Madison engaged in a kickback scheme, in violation of Mitrow's duty of loyalty and to provide honest services to Access.

## CONCLUSION

For the reasons set out above, the Court (1) finds an 18-level upward adjustment for loss warranted under U.S.S.G. § 2B1.1(b)(1)(J), based on a $2,701,259.43 loss; and (2) declines to

---

[12] Questioned by the Court at the hearing, Mitrow admitted knowing that his counsel could not ethically participate in tape-recording Madison, as a represented co-defendant.  Tr. 903–04.  Mitrow therefore did so on his own, and presented counsel with the tapes afterwards.  *Id.*

find any other upward adjustment applicable that was not agreed to by the parties in the plea agreement. Mitrow's guideline range, based on an adjusted offense level of 24 and a criminal history category of I, therefore is between 51 and 63 months imprisonment.

Sentencing will go forward as scheduled, on October 14, 2015.


SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: September 8, 2015
      New York, New York

31